Okay, Mr. Welch. May it please the Court. Good morning, Your Honors. My name is Chad Welch. I represent the Plaintiff Appellant Mark Muller on this appeal. If I may, I'd like to reserve four minutes in rebuttal, please. There are two primary issues in this appeal I'll discuss today. First, whether the District Court erred in granting summary judgment against Mr. Muller's Title VII retaliation claim, and second, whether the District Court erred in granting summary judgment against Muller's age discrimination claim. Because there's a conflict in substantial evidence, the District Court committed error on both accounts. I'll address those issues in that order, but before I do, I thought it would be useful if I prefaced my argument with a very brief, succinct timeline of the most salient events. In late June 2017, Mr. Muller went to his supervisor, Hardy Wheelis, and reported discriminatory conduct against two of the subordinates in Mr. Muller's charge. On July 11th, Mr. Muller again met with Mr. Wheelis and made the same complaint. Immediately thereafter that same day, Mr. Muller went to Mr. Wheelis's supervisor, Mr. Budney, who was the plant manager at the plant at which they worked, and made the same complaint. And immediately after that, the same day, Mr. Muller left the plant at which he worked, went to Mississippi Power headquarters in Gulfport, and made a formal complaint of gender discrimination relating to two of his female subordinates to the company's employee concerns department. July 12th, the very next day, Vicki Pierce, the person to whom Mr. Muller made his gender discrimination complaint, had a telephone conversation with Alan Reeves, the vice president of the company. She informed Mr. Reeves that Mr. Muller had come in and made a gender discrimination complaint to which he responded, Mr. Muller is a whiner and needs to be fired. In his complaint to Wheelis and Budney, he did not mention anything, did he, about sex  That's a disputed fact, Your Honor. Mr. Muller contends that he did in fact tell both of each of them independently and separately. Both of them deny that he made such a complaint. I would point out Mississippi Power, in its response brief on appeal, had block quoted some of Mr. Muller's testimony in this point where he says, I made the complaint, I'm not sure if it was heard. In other words, he's saying he thought it fell on deaf ears. He then went downtown and made a formal complaint to employee concerns. July 18th, Mr. Reeves and Mr. So did the formal complaint mention sex or gender discrimination? It did, Your Honor. And in fact, the person who received the complaint, her name was Vicki Pierce, she testified that she understood the complaint to be about gender discrimination. She also understood that it involved two specifically named females on Mark Muller's team. I think Miss Pierce said that when he came in and he did make the complaint about gender discrimination, but he said, I'm probably gone for that uproar I made in the office. Two points on that, Your Honor. First, she did testify. I think the statement she said in her deposition was, Muller said, I'm a goner. However, it's worth noting that she took very copious notes of that meeting, five pages worth of notes, and nowhere in those notes where she's in fact quoting what Mr. Muller is saying, nowhere in those notes does she record the fact that Mr. Muller allegedly made that statement. There's no testimony from Mr. Muller that he uttered that statement. He's now making the statement? He was never asked about it, sir. July 18th, Mr. Reeves and Mr. Norman Collins, chief of human resources, exchanged emails discussing Mr. Muller's age in retirement in connection with his impending separation from the company, and on July 28th, Mississippi Power terminated Mr. Muller's employment. So that four-week period is what brought Mr. Muller's 36-year career with Mississippi Power to an unfortunate end. Didn't Ms. Pierce, though, and Wheelis talk about trying to, ask Wheelis to consider holding him over through extended vacations or something so that he could reach age 62 and be eligible to retire? Wasn't that a, I mean, couldn't you draw the inference, or isn't that the correct inference, if that's the reason they sent all that personnel information over? Yes, Your Honor, I believe Mr. Collins testified that the reason he discussed age in retirement was out of some potentially charitable consideration to give Mr. Muller some leave and bridge him to retirement. Now, that is Mississippi Power's explanation for those comments, but in order to accept that explanation, you either have to accept it as true on its face, or you have to draw an inference in Mississippi Power's favor, but the case law says if you can draw a benign inference or a discriminatory inference from the comments, then the inference must be drawn in favor of the non-movement, in this case, Mr. Muller, and there's no question they were approximate in time to the discharge, only 10 days prior. Does Mr. Muller dispute that he made a real disturbance in the office and was combative with Wheelis and Bunden about sending him home and sanctioning him, giving him some kind of write-up for it? Your Honor, I think his testimony was he emphatically disputes Mr. Wheelis' and Mr. Bunden's characterization of his behavior. What does he admit that he did? He says that he went to a meeting with Mr. Wheelis, and Mr. Wheelis was, on July 11, was going to present Mr. Muller with essentially a written counseling statement about something that happened a couple of weeks before, and at that time, he made his second complaint to Mr. Wheelis. He denies acting in, engaging in an outburst, tirade, or anything of that nature. After Mr. Wheelis wouldn't hear him on the complaint, he went to Mr. Bunden, and again, the complaint fell on deaf ears. This is a classic he said, he said situation. Mr. Wheelis says that Mr. Muller acted in a certain manner. Mr. Muller emphatically denies that. The jury's going to have to resolve, make a credibility determination on remand. I want to talk about the direct evidence for Mr. Muller's Title VII retaliation claim. This is a rare case with direct evidence, and because of that direct evidence, it becomes Mississippi Power's burden to prove that it would have fired Muller irrespective of the discriminatory animus, and that burden shifting in itself warranted denial of summary judgment. Here's a summary of the direct evidence. Muller made the gender discrimination complaint to employee concerns on July 11. Pierce reported that complaint to Reeves on July 12. Reeves was the most senior person involved and the ultimate decision maker. His response was, Muller's a whiner for making the gender discrimination complaint and needs to be fired. As of that day, there was no intention of terminating Mark Muller's employment. Pierce recorded notes of her conversation with Reeves and memorialized what he said. She testified clearly that Reeves responded to Muller's gender discrimination complaint by calling him a whiner and stating that he needed to be fired. This does not require any inference. Discriminatory intent is apparent on the face of . . . Even if you have direct evidence of discriminatory intent, whether you're proving intent by direct evidence or circumstantial evidence, you still have to show protected activity. The district court seemed to think the direct evidence was a bypass of protected activity, but that's an element regardless. Then you just get to this question, if you have protected activity, of was there this intent to retaliate? I'll jump ahead then to protected activity. But do you agree that even in a direct evidence case, that that's about proving intent and you still, it's a basic element to prove, establish protected activity? Yes, Your Honor. So why don't you address that? I'm going to jump forward to protected activity and I'd like to jump back because I have one more important point I think needs to be made. Like you said, Judge Costa, the district court concluded that Mr. Muller didn't engage in Now, but it has long been the law in this circuit that Title VII's opposition clause extends protections to those who reasonably believe they oppose unlawful practices. The best evidence of this in this case that the district court did not even mention is Wendy Fayard's second declaration. Ms. Fayard was one of two female subordinates on Mr. Muller's team. I'm going to paraphrase what she says in the declaration, but she said, she testifies that she was discriminated against on the basis of her gender. She reported those concerns to Mark Muller and she expected Mark Muller to handle the matter on her behalf and report it through appropriate channels. I think it's important to think about for a moment the context in which Mr. Muller was told these things. He was new, although he had been at Mississippi Power Company for nearly 36 years by that point, he was new to Plant Daniel. He assumed responsibility for an operational crew at Plant Daniel in approximately March of 2017. So he's new to the plant, he's in a new environment, he has new employees in his charge, two of them are female, one of them comes to him and says, I believe I'm being subjected to gender discrimination and here's why. So it's against this backdrop that Mr. Muller's belief must be measured. Ms. Fayard affirmed her testimony during a deposition at which Mississippi Council, Power Council was present and cross-examined him, and it was based on what Ms. Fayard told him that Mr. Muller took notice of certain conduct directed towards Ms. Fayard and Ms. Combest, which he believed corroborated or confirmed or substantiated Ms. Fayard's allegations of discrimination against her on the basis of her gender. I think it's important to, if we can try to place ourselves as a reasonable person in Mr. Muller's position at the time, if he's new to a plant with new employees and a female makes this complaint, I think it's perfectly reasonable for him, if he sees actions that seem to confirm or corroborate what he's been told by a subordinate, he's perfectly justified in going to employee concerns and using a formal grievance process to raise a gender discrimination complaint. Had he not done that, he could have been concerned that he perhaps had been complicit in activity that was prohibited under Title VII. Other evidence that corroborates or substantiates Ms. Fayard's allegations of gender discrimination. During a plant manager meeting at which management was present, two alleged discriminators, Skipper Smith and Hardy Wheelis, singled out one of the females on Mr. Muller's crew, Presha Combest, and suggested she needed to perform what is essentially a competency assessment of her skills. But she had performed those such tasks under Mr. Muller's charge many times. He never observed any deficiencies in her core competencies. There were no documented deficiencies in her file. She testified that she was blindsided by this. She felt singled out. She intimated to Mr. Wheelis that it was because she was a girl. And both she and her union representative testified that had she failed the walk-down, she could have been subject to something. In other words, she had nothing to gain from the walk-down but something to lose from it. Both Ms. Fayard and Ms. Combest later made statements to Russell Bush, a union representative, that Skipper Smith did not like women in the workplace and treated people differently to a gender issue. Ms. Fayard had been removed and kept off the substitute team leader list due to what she claims was a false allegation of sick leave abuse. And she had never exceeded her allocated hours of sick leave. And in one event, Mr. Wheelis tried to prevent Ms. Fayard from working by forcing her to use sick leave. And she apparently did not want to use sick leave because she had been falsely accused of abusing it in the past. And it had been hampering her career progression because she was not allowed to serve as a substitute team leader while she was under Mr. Mueller's charge. So these are the sorts of things that happen in a very compressed period of time, but after Mr. Mueller is new to the plant and has a female subordinate tell him that she's subjected to gender discrimination. If I could, before my time on opening expires, I want to hop back forward to direct evidence. The district court in saying that there was not direct evidence in this case, that was its most critical and most dispositive error in my view. The district court for that proposition cited and relied on Fabella v. Socorro Independent School District 329 Federal 3rd 409, a Fifth Circuit case from 2003, and Judge Davis, you were on the panel, sir. Fabella confirms that this is a direct evidence case. In Fabella, a plaintiff filed an EEOC charge that was unsubstantiated. A supervisor referred to her as a, quote, problem employee for filing that EEOC charge. This court held that referring to plaintiff as a problem employee for filing an EEOC charge constituted direct evidence of discrimination that shifted the burden to the defendant.  If referring to a plaintiff as a problem employee for filing an unsubstantiated EEOC charge is direct evidence of discrimination, then referring to Mark Muller as a whiner for making a gender discrimination complaint also must be direct evidence of discrimination. We don't know for sure that that's why he called him a whiner, do we? I mean, they had all these issues in the office about him revealing confidential information and he objected to being sanctioned for that. And I mean, he went up the line, he went to his supervisor and then went above his head and then, so, I mean, there's a lot of reasons for, I mean, there are multiple reasons why they could have called him a whiner, wasn't it? Well, Your Honor, I think if you look at Mrs. Pierce's testimony, and I laid it out in the first part of the argument in the reply, I think that speaks for itself. She's very clear about what he meant. That was his response to her telling him he made a gender discrimination complaint. He's a whiner. He needs to be fired. The last thing I'll say on that point is, and I've looked again at the appellee's brief last night for record sites that support the proposition that Mr. Reeves, who uttered this statement, knew about this alleged conduct that, again, Mr. Muller denies. Those record sites, in my view, don't support that. In other words, the only evidence Mr. Reeves had on July 12th was that Mr. Muller made a gender discrimination complaint, and that was his reaction to it. Thank you very much. All right. Thank you, Mr. Welch. Mr. Muller?  Yes. Very quickly, with regard to the issue as to whether or not there was any statement by Mark Muller of gender discrimination in the meeting on June 29, or the meeting on July 11, or even, for that matter, in front of the concerns group that afternoon, sometime after 3.35 p.m. on July 11, there's nothing in this record where he can tell us, and indeed, upon examination in his deposition, was able to say, I remember using the word gender discrimination, sex discrimination, anything like that. Indeed, after we went through all these questions in his deposition and got down to the question that, well, you were at the concerns group, this was your last meeting after this series of disputes and meetings, what did you say? And he said, as you'll see on the record at page 366, question, focusing on your meeting with regard to the concerns department, downtown, as you say, used the word discriminatory, but when you met with them, did you use the word unfair treatment? Quote, I don't think that the words really matter. I think what's important is that I know myself as a manager, actions or events that happen would be the most important that how a person parses words. I don't personally see any difference in the word discrimination and the word unfair treatment. Now, some of these cases that have been mentioned by the parties in briefing talk about context. So let's consider the context of this individual as ... Why did your own employee, Ms. Pierce, say she understood the complaint Mueller made to have been one about gender discrimination? She didn't actually say that, Your Honor. If you read all of the record excerpts from that section, you'll see that these are leading questions from Mr. Welch. My partner, Ashley, objects ... You can ask leading questions when you cross-examine.  Yes. And they, of course, get to a point where she specifically asked, now in the voicemails that you left for Alan Reeves, did you say anything about the subject matter of the concerns? Because she had a duty to report that an employee under his authority had filed a concern. But under the concerns department system, the concerns department is not to disclose to management what the concern is about. And as she points out in her testimony, no, I did not disclose that. There was no indication in the voicemail about the subject matter. And as Ginger Lehman points out, that was also true in her case. Now ... So the concern, Pierce, didn't mention gender discrimination? No. If you read all of the excerpts that are part of the record dealing with Vicki Pierce ... I mean, is there any evidence, not all the excerpts ... Yes. Is there any evidence that she told the management, he came in here talking about gender discrimination? No, your honor. And indeed, I have provided the court with two visual aids. And if you look at this, and I apologize because of course there is so many events on here, if you go halfway through it and go up to July 11, the key date, as you'll see, there is an upper section as to what happens when Mark Muller leaves Nick Budney's office, who is the plant manager, and there is a lower section. And as you can see, in the upper section, Mark Muller does leave Budney's office and goes to concerns. He doesn't immediately go to concerns, because remember, the record shows that he says when he gets to concerns, I'm a goner and I've already checked on my pension. He leaves Nick Budney's office in the morning, does not arrive at concerns until we know 3.35 p.m. from the record, the actual notes of Vicki Pierce. And then Pierce calls Ginger Lehman, who is at the plant. She is a plant human resources representative. She doesn't report to Norman Collins, the employee relations manager, which is a separate group. She says, well, no, we don't have any plans on firing him. We're going to have a meeting the next morning, because remember, on July 11, he was on a one-day suspension as a result of the meeting that morning. Then, as you can see, Dawson, who is a member of the corporate security department and was president of the concerns department, is assigned the investigation. The sequence of events, if you look at the record excerpts for Ginger Lehman, shows Ginger thought it was a one-day suspension and that tomorrow morning she was going to have a meeting with Cardi Wheelis and with Mark Muller to resolve matters, and he goes back to work. She receives a call, as shown in her record excerpts, either late that night or first thing early that morning, because, as she says in the record, she cancels the meeting because Nick Budney has told her already, we're thinking, based upon the outbursts in his office, about firing this guy. And that is her testimony, and that straightens out this timeline. I'm just looking at part of the record. Did she or did she not, at page 967, say she agrees she understood the complaint he made to have been one about gender discrimination? Yes. You're saying that's not what page 967 says? No, no. No, Your Honor, I'm saying she understood, sitting there, that she suspected this may be a case of gender discrimination. She ultimately concluded at the end of the investigation that it was not, but she clearly suspected it.  But, again, while appellant wants to turn this case into a causation case, and let's look at suspicious circumstances, and let's try to parse or confuse what the sequence of events is, remember, the district court dismissed the retaliation claim on the basis of the opposition clause, and the fact that there is no way a reasonable supervisor in this case could come to the conclusion that he had an objectively reasonable belief that he was opposing unlawful employment practices. Now, let's go through these, and of course I provided the court with this visual aid. Let's go through these four incidents that Mark Mueller claims are the unlawful employment practices. I would point out, first, as a matter of definition, they aren't employment practices. They're incidents. First one, walk-down. Presha Kambas, as a result of the pre-consistency meeting and the discussion among operations team leaders on June 21, was directed to do a limited two-hour walk-down. That was the extent of it. She suffered no loss of pay. She did not think it was discriminatory. That's in the record, her testimony, and, of course, she suffered no adverse personnel action in any way. Now, the second event— Does it have to be an adverse personnel action for you to think that someone's being discriminated against? It has to rise to the level of an adverse personnel action for you to reasonably believe, or you have to reasonably believe, that it's an—that's your opposing practice made unlawful by Title VII, and that typically is or requires an adverse personnel action. What's your best case for that? Well, the Hernandez case touches upon that. Together with the Kilgore case— Well, I don't want to take up too much of your time. You can send us a letter. Yes, I certainly would be happy to, Your Honor. Going on to the next event, this was, of course, the so-called boot event. The actual employment practice is simply the standard operating procedure of most employers. If you have suffered an injury, you have to bring a medical certificate, and it has to say whether or not you were released for work and whether you can do light duty and what accommodations, if any, you need. That was the practice. The practice is not being attacked. The event in this case was she failed to bring the medical certificate. She wanted to go to work. She met with her union representative, President Russell Bush, out in the parking lot. They called what is referred in the record as the disability nurse, Derek Tisdale, who works for Mississippi Power Company. He approved her to come to work. He had never seen her. He knew no facts. She came to work, sat in the control room all night, and did no meaningful work. As a result of that, Hardy-Wheelis did counsel Mark Muller, who approved this, about the fact that she needs to comply with standard operating procedure. That was the end of it, and Hardy-Wheelis, by the way, admitted in his deposition testimony that he would comply with the policy, and now he understood it, and he didn't have any issues with it. The gypsum spill. This is perhaps one of the most curious incidents to claim that you're opposing practices made unlawful. The gypsum spill dealing with Mark Muller's crew, Crew E, occurred in 2016, before Mark Muller even worked at Plant Daniel. He was comparing something that he knew nothing about to an event on Skipper Smith's Crew D in 2017 that, again, he knew nothing about because he didn't work on Crew D. He compared the two on the basis that four of the employees on Crew E in 2016 were disciplined, three males and one female, versus none were disciplined on Skipper Smith's crew during a spill in 2017. Now, as Mark Muller admits, he had no personal knowledge of either spill or any of the facts dealing with the spill. Again, going back to the language of the statute and going back to the case law, reasonable belief about opposing an unlawful employment practice and that you have to have a reasonable belief that it is an unlawful employment practice. There's no employment practice here that's gender-based in any manner. Three males, one female were disciplined. Three males and one female on that crew in 2016, including Precia Cumbas, were not disciplined. Going on to the last of the incidents that Mark Muller claims is a practice that he was The removal of Wendy Fayard from the substitute leader list, that is, the operations team leader list. The problem with this incident is the removal occurred in 2016 when he wasn't even at Plant Daniel. He has no personal knowledge of the circumstances of the removal, although he understands that he was told that it was because of performance issues and attendance issues. And of course, as the record shows, she was written up in 2016 as needs improvement on the issue of dependability. No difference in how male employees are treated. As the record shows, there are seven male employees who have been written up as needs improvement in the area of dependability. Now, with respect to the retaliation claim, this is the end of the retaliation claim if, as the district court found, he could not reasonably believe that he was opposing practices made unlawful by Title VII in referencing these incidents. I would also add that in terms of level of sophistication, please look at the record starting on page 397, where you'll see seven pages of his training log and courses completed. In these seven pages, you will see that he completed courses on diversity, inclusion, EEO and affirmative action, leadership and management, among others. So he certainly knew what an unlawful practice was and generally was not under Title VII. Turning to the age claim, again, as we know from all these cases, whether it's the Long vs. Eastfield College case, whether it's the LSU case dealing with Instructor Herster, there has to be at its core ageist or age-related comments or, in the case of these gender issues, there has to be gender comments. But let's look at what should be, of course, characterized here as the target defendants. Alan Reeves, Vice President of Generation, Hardy Wheelis, of course, a named defendant in this case, and Mark Mueller's supervisor, and Skipper Smith, a peer. None of these individuals throughout this case, you know, have been found to have made any ageist comments or any gender-based comments. With regard to, of course, the alleged direct evidence of age discrimination, look at Texas Instruments and its progeny, the EEOC vs. Texas Instruments case, of course, which is a 1996 case. There's many cases that have followed it, but all have followed it. Discussing retirement issues with an employee even before termination is not an unlawful employment practice, and it is not evidence of age discrimination. In this case, this discussion between Norman Collins and Alan Reeves occurred six days after the decision had been made to terminate him. And this was a decision, gee, we're going to terminate him, how can we let him down lightly? You know, we're human resources, I'm Norman Collins, the employee relations manager, here's some possible scenarios, he's approaching 62, do you want to do anything to try to bridge him to early retirement under the Social Security system, but also, of course, retirement under the Mississippi Power System, which he was already eligible for retirement under that system. And the decision by Alan Reeves was no, under the circumstances of this case, the combativeness, the hostile behaviors for which he was terminated, that go back to the events on June 29 and July 11. Again, with regard to the age discrimination case, whether you want to call it, use the circumstantial evidence test, you have to find discriminatory animus. There has to be indications of discriminatory animus based upon age. Here there is nothing with regard to discriminatory animus on age, or for that matter, against females or based upon gender that would in any way support, relate, or assist the Mark Mueller's case with regard to gender or retaliation discrimination. Mr. Mueller challenged the version of Willis about the combativeness and aggressiveness that he showed during that meeting, didn't he? Yes, he did, Your Honor. Why don't we have to accept that? Because what he does admit, Mark Mueller admits, is that he was not calm. He denies the level of aggressiveness and hostility, but he admits in the record that he was not calm, and he never accepted the report on disciplinary action. That's in the record. There's a place where you sign. When it was given to him, he was supposed to sign it, he was supposed to date it. There's an employee comment section. You can comment. He didn't do any of those things. A clear rejection. As explained by Alan Reeves and Nick Budney in their testimony, part of the record, phase one, the ROTA, was to correct his behaviors, counsel him, get him back on the right track as an operations team leader. And that would have been it. Presumably, we would not be here today if he simply accepted the one-day ROTA, even if he put it on his form, I disagree. But he did not do that. And as a result of his complete rejection of this effort to correct his behavior on breach of confidentiality, which is unquestioned, and going forward and opposing the ROTA and counseling, that's, of course, what resulted in termination. But again, let's not lose sight of the fact. You can be fired for a good reason, bad reason, no reason at all, or an erroneous reason. That's not unlawful. And in this case, for it to be unlawful, he would have to have reasonably believed that he was opposing practices made unlawful. And the standard against which those practices are measured is the standard of law. And the fact is, these incidents don't rise in any way to that level. All right. Your time has expired now, Mr. Mueller. Thank you. Thank you. Thank you, Your Honor. Anything else for rebuttal? Your Honors, just so we're clear, because I don't think I am, I think the argument was that Pierce may have understood Mr. Mueller's complaint to be one about gender discrimination, but perhaps Mr. Reeves did not. Record excerpts 960 and 964 through 965, deposition of Vicki Pierce, question posed to her. So when you talk to Alan Reeves, you told him essentially Mark Mueller came in and made allegations of discriminatory conduct against two women, right? Right. But Reeves used the word whiner, he used the word whiner. And he knew when he used the word whiner, he knew that Mark Mueller had physically come to employee concerns and made an allegation that two employees were being targeted. Yes. And his response to that was Mark Mueller is a whiner? Yes. And because Mark Mueller is a whiner, he says that Mark Mueller needs to be fired. Is that right? Yes. Now, I think the evidence is very clear that there is direct evidence in this case. And because there's direct evidence, everything that counsel just explained on this chart that it gave the panel apparently before argument this morning, it's burden to adduce these facts at trial and convince a jury that its version of the events is the correct one. Mr. Mueller told us a minute ago that there is no gender-based employment practice in this record. What is the gender-based employment practice? Well, Your Honor, I'll preface my answer by stating that in Payne v. McLemore's, the court explicitly rejected the position that proof of it. Why don't you answer my question? You're fast running out of time. To answer it, you have to look at Wendy Fayard's second declaration. Mr. Mueller, as your subordinate, I'm being subjected to gender discrimination and here's why. She tells him about the gypsum overflow event that occurred before Mr. Mueller came to the plant, but that is context for Mr. Mueller. Now, hypothetically, had she brought some sort of a claim on her own behalf for that event, I agree. I don't think she would have had a Title VII claim. But she talks, she tells Mr. Mueller, I am continually kept off the substitute team leader list for a false allegation of sick leave. I never, I never exceeded my allocated hours. And then Mr. Mueller tries to show us about whether that was sex-based or gender-based. Well, she, she has, you have testimony in the record that Ms. Cumbess told Russell Bush that, or both women told Mr. Bush that Skipper Smith doesn't like women in the workplace. They're treated differently because of a gender issue. Ms. Cumbess testified about the competency assessment, because, singling her out because she was a girl. And those things, Mr. Mueller testified, that confirmed in his mind, based on what Ms. Fayard had already told him when he's their newly appointed team leader, that there is some targeting going on. And I would, I would encourage this panel to look to— Just because they said so. Well, I think it puts him on reasonable notice that something is afoot. And he, and when he sees incidents that he believes corroborate or substantiate what Ms. Fayard told him, I think it's incumbent on him to report it. And I don't think he can be faulted for having a belief that there might be some truth to what she told him, based on what she observed. As a, as a closing point, I see I have 15 seconds left. I'd point the panel to EEOC versus RightWay. Judge Costa, that's an opinion you wrote. I think that case in Long v. Eastfield College makes clear that these, there's a zone of conduct that doesn't always lend itself to judicial line drawing. Whether there's a reasonable belief is a question for a jury. Thank you very much for hearing Mr. Mueller's appeal. Thank you, Mr. Welch. Your case is under submission. Third case for today, Holland v. Westmoreland Coal Company.